# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHANNON RUTHERFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV 15-S-560-NE |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

"Theodor Seuss Geisel (perhaps better known as Dr. Seuss) is said to have observed, 'Sometimes the questions are complicated and the answers are simple.'"[1] Regrettably, this is not one of those times. Not only are the issues in this case complex, but so also are their answers.

## I. SUMMARY OF FACTS

Plaintiff, Shannon Rutherford, seeks damages for personal injuries sustained on Redstone Arsenal: a 38,125 acre (7.9 square mile) United States Army garrison adjacent to the City of Huntsville in Madison County, Alabama.[2] Access to the Arsenal is restricted because the garrison is a military installation, and important research and development functions are performed there. More than sixty federal

---

[1] *United States v. Baptiste*, No. 16-10871, 2017 WL 5712514, at *1 (11th Cir. Nov. 28, 2017) (Rosenbaum, J.).

[2] *See, e.g.*, http://www.mybaseguide.com/army/124-3546 (last visited Dec. 8, 2017).

organizations and contractor operations occupy facilities on the Arsenal, including

nine Commands of the United States Army,[3] five agencies of the United States

Department of Defense,[4] and the National Aeronautics and Space Administration's

George C. Marshall Space Flight Center.[5]  Persons authorized to enter the garrison

do so through one of six gates, which are referred to in Army regulations as "Access

Control Points (ACPs)."[6]  The events leading to this action occurred at "Gate 1" on

Martin Road East:  a four-lane highway that traverses the Arsenal from east to west.

The security guards who served at that Gate were employed by the United States

---

[3] The Army Commands include, among others:  the Materiel Command; the Aviation and Missile Command; the Space and Missile Defense Command; the Test and Evaluation Command; the Developmental Test Command; the Security Assistance Command; the Contracting Command; the Expeditionary Contracting Command; and, the Aviation and Missile Research, Development, and Engineering Center.  *See, e.g.*, http://hsvchamber.org/departments/government-public-affairs/team-redstone (last visited Dec. 8, 2017).

[4] These agencies include the Defense Intelligence Agency; the Missile and Space and Intelligence Center; the Missile Defense Agency ("MDA"); the MDA's Ground-Based Mid-Course Defense Agency; and, the MDA's Targets Test & Sensors Center.  *Id.*

[5] *See* doc. no. 51 (Transcript – Sheehy), at 32-36.

[6] *See, e.g.*, Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), ¶ 1.2 ("An Access Control Point is a corridor at the Installation entrance through which all vehicles and pedestrians must pass when entering or exiting the Installation.  The perimeter of the ACP consists of both passive and active barriers arranged to form a contiguous barrier to pedestrians and vehicles.  ACP guards control the active barriers to deny or permit entry into the Installation.").

**Note well**:  Plaintiff objected to this exhibit during trial, saying that the Government had failed to produce it in response to plaintiff's pretrial request for production of "any standards, protocols, policies, [or] procedures that [were] germane to this case.  Doc. no. 51 (Transcript – Sheehy), at 171.  This court admitted the exhibit "provisionally."  *Id.*; *see also id.* at 191.  Now having thoroughly reviewed the document, its relevance to the discretionary function exception discussed *infra* is patently clear.  The failure of Government's counsel to comprehend the significance of the document is due no commendation.  Even so, this court demanded its production during the examination of Col Sheehy, in order to clarify his testimony.  Accordingly, the objection is **overruled**.

Army Aviation & Missile Command, and had at their disposal an "active vehicle barrier"[7] known as a "Ground Retractable Automobile Barrier (GRAB)," which is described as an "electrically powered, hydraulically operated, sub-surface mounted device designed to be fully functional at stopping a vehicle attempting unauthorized entry on the installation."[8] Colonel Michael Robert Sheehy (U.S. Army Ret.) was Director of Emergency Services at Redstone Arsenal on the date of the events leading to this suit.[9] He explained that the GRAB Barriers at Gate 1 were located

> approximately 900 feet from the Access Control Point itself [*i.e.*, the entry gate house at which Security Guards were stationed]. And in between the inbound and outbound lanes there is . . . a [concrete] physical barrier that would prevent vehicles from passing from one side to the other.
>
> The distance [between the gate house and GRAB System barriers] is designed to give the guards . . . enough time to assess the situation and to activate the GRAB net barrier before a potential threat can enter the Arsenal.

Doc. no. 51 (Transcript – Sheehy), at 42 (alterations and ellipses supplied).

Plaintiff was employed at NASA's George C. Marshall Space Flight Center as

---

[7] "Active Vehicle Barriers" are "controlled by ACP guards [and] must be utilized in each inbound and outbound lane to permit or deny vehicle access." Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app. A (Army Standard for ACPs), ¶ 2-2.2.2 (alteration supplied).

[8] Plaintiff's Ex. 1, at Rutherford_000029 (29 Sept. 2010 Redstone Arsenal General Orders for Access Control Points, Annex B), ¶ 3. **Note well**: Each page of Plaintiff's Exhibit 1 bears a Bates' Stamp number beginning, as here, with the prefix "Rutherford_0000." For convenience, all subsequent citations to the pagination of that exhibit will eliminate the Bates prefix.

[9] *See* doc. no. 51 (Transcript – Sheehy), at 9.

a "Flight Systems Engineer."[10]  She had obtained permission to be off work for several hours on Thursday, May 10, 2012, on "sick leave," in order to be examined by a private physician in the Huntsville Hospital Medical Mall on Governors Drive.[11] She was driving her personal automobile in the right-hand, outbound lane of Martin Road at approximately 9:30 a.m., and about to exit the Arsenal through Gate 1:  a point that was approximately five miles from plaintiff's NASA workplace.[12]

Shortly before plaintiff reached the exit, however, a pick-up truck driven by an older man named Tommy Bannister approached Gate 1 from the opposite direction.[13] Mr. Bannister did not possess credentials to enter the Arsenal, and appeared to Gate Guard James Jones to be "a little confused" and "lost."[14]  Mr. Bannister said that he was attempting to reach the municipal airport or some other address on the opposite, west side of the Arsenal, off Government property, and thought he could cut across the garrison as a means of shortening the driving distance to his intended destination. Gate Guard Jones explained to Mr. Bannister "that he couldn't just pass through, that it was a controlled area," and instructed him to drive forward a few feet, to the so-called "turn-around lane," where he could make a "U-Turn" into the outbound lanes

---

[10] *Id*. (Transcript – Rutherford), at 142.

[11] *Id.* at 143.

[12] *Id.* at 143-44.

[13] *Id.* at 80.  *See also* Plaintiff's Ex. 3 (May 15, 2012 Military Police Desk Blotter), at 64.

[14] Doc. no. 51 (Transcript – Jones), at 81.

4

of Martin Road.[15]  Mr. Bannister did not follow that instruction, however.  Instead, he drove past the turn-around lane,[16] but only "at an average take-off speed"[17] of "about 10 to 15 miles an hour."[18]  Jones stepped into the Gatehouse and depressed a button to activate the GRAB System,[19] and steel-net barriers rose from the ground under *both* the inbound *and outbound* lanes of Martin Road.[20]

Before Jones activated the GRAB System, he did not make any attempt to survey the outbound lanes of Martin Road in order to determine whether the barrier

---

[15] *Id*. at 82-83.  *See also* Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app. A (Army Standard for ACPs), at ¶ 2-2.6 ("**Turn-around Lanes**.  ACPs must have at least two turn-around lanes, one before and one immediately after the identity check or vehicle search area.") (boldface in original); doc. no. 51 (Transcript – Sheehy), at 49-50 (observing that the turn-around lane at Gate 1 – *also sometimes referred to as* "*the response zone entrance*" – is located immediately past the guard booth.  "At other Access Control Points, the [*turn-around lane*, a/k/a *response zone*] entrance is a further distance down the road.  But in the case of Gate 1, the turnaround point is immediately after the guard shack.") (alteration and emphasis supplied).

[16] Doc. no. 51 (Transcript – Jones), at 83 ("He rolled his window up and proceeded forward."); *id*. at 85 ("He proceeded straight ahead on Martin Road.").

[17] *Id*. at 85.

[18] *Id*.

[19] *Id*. at 86.  *See also* Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app. A (Army Standard for ACPs), at ¶ 2-2.7 ("**Gatehouse**.  ACPs must have a gatehouse with the primary controls for the final active vehicle barriers.  The gatehouse must be sized to accommodate ACP guards and their activities.") (boldface in original).

[20] The single control button at Gate 1 that raised the GRAB System Barriers stored under both the inbound and outbound lanes of Martin Road was different from the System installed at Gate 9, which provides access to the Arsenal's major north-south corridor, and which had *two activation buttons*:  one for the GRAB barriers stored under the inbound lanes, and a separate button for the barriers under the outbound lanes.  Significantly, Gate Guard Jones had activated GRAB System barriers only once before May 10, 2012, and that was while serving in the Gatehouse at Gate 9.  On that occasion, he had raised only the barrier under the inbound lanes.  Doc. no. 51 (Transcript – Jones), at 86-87.  That option was not available to him at Gate 1.

might impact innocent motorists about to exit the Arsenal.[21]  As a result, plaintiff's

automobile collided with the barrier that rose from the ground under the outbound

lanes, and she was seriously injured.[22]  She filed an administrative claim with the

United States Army Aviation & Missile Command on October 30, 2012, and

commenced this action on April 3, 2015.

## II.  PLAINTIFF'S CLAIMS

Plaintiff alleges under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-

2680 ("FTCA"), that the following acts by representatives of the United States were

negligent, and that each "independently caused (and/or combined and concurred to

cause) plaintiff's injuries":[23]  (1) the Army's decision to design the GRAB System

installed at Gate 1 with a single, master-control button that simultaneously activated

the steel-net barriers stored under both the inbound and outbound lanes of Martin

Road; (2) Gate Guard James Jones's failure to retain Mr. Bannister's driver's license,

which contributed to Bannister's failure to turn his truck around and exit Arsenal

property; (3) Jones's decision to activate the GRAB System when none of the threat

scenarios specified in controlling Army regulations were presented;[24] and (4) Jones's

---

[21] *Id.* at 87-88.

[22] Doc. no. 1 (Complaint), ¶¶ 8 & 9.

[23] Doc. no. 32 (Pretrial Order), at 4; doc. no. 45 (Amended Pretrial Order), at 4.

[24] Doc. no. 32 (Pretrial Order), at 3-5.

failure "to make a 'reasonable effort to ensure' that no other vehicles would be affected by deploying the GRAB System."[25]  Defendant's primary response to those claims is based upon the "discretionary function exception" to the FTCA, which deprives federal courts of subject-matter jurisdiction over tort claims resulting from a federal employee's performance of a "discretionary function."[26]  Accordingly, that issue must be resolved before taking any steps to address the merits.  *Morrison v. Allstate Indemnity Co.*, 228 F.3d 1255, 1275 (11th Cir. 2000).

### III.  THE DISCRETIONARY FUNCTION EXCEPTION

Historically, suits seeking damages for the negligent or wrongful acts of employees of the United States Government were barred by the common-law doctrine of sovereign immunity.  *See*, *e.g.*, *Alden v. Maine*, 527 U.S. 706, 715 (1999); *Cohens*

---

[25] Doc. no. 38 (Plaintiff's Unopposed Motion to Amend the Pretrial Order), at 2; *see also* doc. no. 45 (Amended Pretrial Order), at 4.

[26] Even though the Government mentioned the discretionary function exception in the answer to plaintiff's complaint filed on September 30, 2015 (*see* doc. no. 15 (Answer), at 7), the Government did not raise the defense by way of motion until the month after the Pretrial Conference. *See* doc. no. 32 (Pretrial Order entered on July 13, 2017, and setting case for trial on October 10, 2017); doc. no. 39 (Defendant's Motion for Leave to File Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed August 9, 2017); doc. no. 40 (order granting motion for leave to file); doc. no. 42 (Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, entered on the record on August 14, 2017).

Of course, a defendant is free to raise the issue of subject matter jurisdiction at any stage of the proceedings. *See Douglas v. United States*, 814 F.3d 1268, 1280-81 (11th Cir. 2016) ("[A] party may move to dismiss for lack of subject-matter jurisdiction at any time.") (citing Fed. R. Civ. P. 12(b)(1), (h)(1)) (alteration supplied).  Even so, the failure of the Government's attorneys to raise this jurisdictional defense until the eve of trial is not to be commended, as resolution of the defense earlier in the litigation could have saved significant resources of the court and parties.

*v. Virginia*, 19 U.S. 264 (1821).[27]  A limited waiver of that immunity was created in 1946 with the enactment of the FTCA, which grants district courts exclusive jurisdiction over civil actions to recover money damages

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  *See also, e.g.*, *Federal Deposit Insurance Corp. v. Meyer*, 510 U.S. 471, 475 (1994) (observing that § 1346(b) "waived the sovereign immunity of the United States for certain torts committed by federal employees").  The FTCA makes the United States liable for torts to which it applies "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.

Even so, the FTCA does not waive the sovereign immunity of the United States in all respects.  Instead, as the Supreme Court observed,

> Congress was careful to except from the Act's broad waiver of immunity several important classes of tort claims.  Of particular relevance here, 28 U.S.C. § 2680(a) provides that the Act shall not apply to

---

[27] *See generally* Gregory C. Sisk, *A Primer on the Doctrine of Federal Sovereign Immunity*, 58 Okla. L. Rev. 439, 443-45, 456 (2005) (tracing the history of federal sovereign immunity, and concluding that individuals may not sue the United States for monetary damages unless the Government has consented to suit by a statutory waiver of sovereign immunity).

> "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, *or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused*." (Emphasis added.)
>
> The discretionary function exception, embodied in the second clause of § 2680(a), marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense* (*Varig Airlines*), 467 U.S. 797, 808 (1984).

District courts are instructed that the exception must be strictly construed in favor of the Government; and, if it appears that a claim falls within the exception, the court lacks subject-matter jurisdiction. *See, e.g.*, *Swafford v. United States*, 839 F.3d 1365, 1369-70 (11th Cir. 2016) (citing *U.S. Aviation Underwriters, Inc. v. United States*, 562 F.3d 1297, 1299 (11th Cir. 2009); *JBP Acquisitions, LP v. United States ex rel. FDIC*, 224 F.3d 1260, 1263 (11th Cir. 2000)).

## A. The Test for Determining Whether the Exception Applies

District courts must apply a test framed by the Supreme Court's opinion in *United States v. Gaubert*, 499 U.S. 315 (1991), for the purpose of determining whether the discretionary function exception to the FTCA deprives federal courts of

subject-matter jurisdiction over allegedly negligent conduct of a Government agency or employee. *See*, *e.g.*, *Hughes v. United States*, 110 F.3d 765, 767-68 (11th Cir. 1997); *Powers v. United States*, 996 F.2d 1121, 1124 (11th Cir. 1993); *Autery v. United States*, 992 F.2d 1523, 1528 (11th Cir. 1993); *Willett v. United States*, 24 F. Supp. 2d 1167, 1172 (M.D. Ala. 2014).

      1.    **The first part of the *Gaubert* test**— *Was the allegedly negligent conduct mandatory or discretionary?*

As its name implies, the discretionary function exception "covers only acts that are discretionary in nature" — in other words, acts that "'involve an element of judgment or choice.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Accordingly, a court must first look at the nature of the allegedly negligent act, and determine whether its performance involved an element of judgment or choice on the part of the federal agency or employee. *See Gaubert*, 499 U.S. at 322-23; *Ochran v. United States*, 117 F.3d 495, 499 (11th Cir. 1997); *Autery*, 992 F.2d at 1526; *Powers*, 996 F.2d at 1124. That inquiry focuses upon the question of whether the language of "the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner." *Hughes*, 110 F.3d at 768 (quoting *Powers*, 996 F.2d at 1125).

Conduct is *mandatory*, in the sense of being *obligatory* or *compulsory*,[28] when "a 'federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow,' because 'the employee [then] has no rightful option but to adhere to the directive.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536) (emphasis and alteration supplied); *see also*, *e.g.*, *Nguyen v. United States*, 556 F.3d 1244, 1250 n.2 (11th Cir. 2009) (observing that conduct is mandatory "when a federal statute, regulation, or policy specifically prescribes a course of conduct embodying a fixed or readily ascertainable standard").

> Under the applicable precedents, therefore, if a regulation mandates particular conduct, *and the* [federal agency or] *employee obeys the direction*, *the Government will be protected* because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. See *Dalehite* [*v. United States*, 346 U.S. 15, 36 (1953)]. *If the employee violates the mandatory regulation*, [however,] *there will be no shelter from liability* because there is no room for choice and the action will be contrary to policy. . . .

*Gaubert*, 499 U.S. at 324 (emphasis and alterations supplied).

2. **The second part of the *Gaubert* test**— *Applied only when the allegedly negligent conduct is determined to have been discretionary*

---

[28] *See* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 562 (3d ed. 2011) (comparing the American term *mandatory* to the terms *obligatory* and *compulsory* that are more common in English law). Moreover, the design standards promulgated by the Army's Office of Provost Marshal General ("OPMG") discussed in Part III.B.3 of this opinion, *infra*, "consist of mandatory requirements and non-mandatory recommendations. *Mandatory requirements in the criteria are designated by the* [imperative] *words* '*shall*,' '*will*,' or '*must*,' whereas non-mandatory recommendations are designated by the [precatory] words 'should,' 'can,' or 'may.'" Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app. B (ACP Criteria From OPMG), ¶ 2.2 (emphasis and alterations supplied).

On the other hand, if a statute, regulation, or policy does not specifically prescribe a course of action, but instead allows the federal agency or employee to exercise a degree of judgment or choice, then the second part of the test framed by the *Gaubert* opinion must be addressed. It requires the court to determine whether the allegedly negligent discretionary conduct was "grounded in considerations of public policy." *Ochran*, 117 F.3d at 499 (citing *Gaubert*, 499 U.S. at 322-23); *see also Autery*, 992 F.2d at 1526-27 ("[E]ven assuming the challenged conduct involves an element of judgment, however, we then must determine if the challenged actions are the kind of conduct that the discretionary function exception was designed to shield.") (alteration in original, citations and internal quotation marks omitted). As the Supreme Court explained in *Gaubert*:

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Gaubert*, 499 U.S. at 324-25 (footnote omitted).

If both parts of the *Gaubert* test are satisfied, discretionary acts of the federal

agency or employee will be protected, even if the particular acts that resulted in injury to the plaintiff were negligent. *See Varig Airlines*, 467 U.S. at 820.

**B**. **Army Regulations Bearing Upon the Application of the *Gaubert* Test in This Case**

Subsections 1 through 3 of the present Part of this opinion describe regulations that prescribe design standards for "Access Control Points (ACPs)" on *all* Army installations, while subsection 4 addresses General Orders that specifically applied to Redstone Arsenal on the date of plaintiff's injuries, and governed Gate Guard James Jones's operation of the GRAB System Barriers at Gate 1.

**1**. **The Basic Access Control Point Design Regulation**

The Protective Design Center of the United States Army Corps of Engineers promulgated a regulation during December of 2004 entitled "Army Access Control Points Standard Definitive Design." The first part of that regulation states, in mandatory terms,[29] that Access Control Points "shall be designed to" achieve three purposes: *i.e.*,

> ***ACPs shall be designed*** [1] **to prevent an unauthorized vehicle or pedestrian from entering the Installation,** [2] ***to ensure safety of innocent ACP users***, **and** [3] **to maximize throughput of vehicular and pedestrian traffic.** In order to meet these diverse and sometimes conflicting requirements, Army ACP designers *must* consider local site constraints and then use creativity and innovation to develop design

---

[29] *See supra* note 28.

13

solutions that meet all of the ACP performance requirements. There are no cookie-cutter design solutions. Each design is unique. Designers *must* carefully consider all of the criteria and then select and design protective measures that will be most effective for the given site.

Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), ¶ 1.3, at 2 (boldface in original, italicized emphasis and alterations supplied).

Part 4 of the same regulation reinforces the second design purpose — that of ensuring the safety of innocent users of the ACP — by using the mandatory phrase "must include" to emphasize that "ACP designs *must include* adequate safety features to ensure the safety of motorists entering and exiting the ACP." *Id*., ¶ 4, at 3 (emphasis supplied). Part 4 also uses the obligatory phrase "must provide" to emphasize that "Active vehicle barrier controls *must provide* sufficient information to ACP guards *to help them decide when to deploy the barriers*." *Id*. (emphasis supplied).[30]

---

[30] The complete text of Part 4 reads as follows:

**4 CONTROL OF ACTIVE VEHICLE BARRIERS**
Active vehicle barriers are an essential element in preventing unauthorized motorists from entering Army Installations. However, *an active vehicle barrier capable of stopping large, moving vehicles* can cause significant damage to vehicles and *can cause injury or even death to vehicle occupants*. Through Army policy and design criteria, *ACP designs must include adequate safety features to ensure the safety of motorists entering and exiting the ACP*. The active vehicle barrier controls are an essential element of the ACP safety features. *Active vehicle barrier controls must provide sufficient information to ACP guards to help them decide when to deploy the barriers*. Active vehicle barrier controls must also close the active barriers upon command of the guards in order to stop a threat vehicle. Finally, the active vehicle barrier controls must provide sufficient warning to non-threat vehicles to allow them

14

Part 2 of the Basic Access Control Point Design Regulation references standards promulgated by three other Army components and incorporates each by inclusion of copies in Appendices "A" through "C": *i.e.,*

## 2.1 THE ARMY STANDARD FOR ACPs

The Army Standardization Committee established the Army Standard for Access Control Points on 14 December 2004. *The standard lists mandatory requirements for all Army ACPs. The standard is included in Appendix A.* The Army Standardization Committee must approve changes, deviations, or waivers from this standard.

## 2.2 OFFICE OF PROVOST MARSHAL GENERAL (OPMG) DESIGN CRITERIA

OPMG, as the Army's proponent for Access Control Points, provided their criteria for ACP's [*sic*] in a document titled "ACP Criteria from OPMG" dated 19 Novembver 2004. *The OPMG Criteria consist of* [*both*] *mandatory requirements* and non-mandatory recommendations. *Mandatory requirements in the criteria are designated by the words "shall," "will," or "must,"* whereas non-mandatory recommendations are designated by the words "should," "can," or "may." OMPG Criteria have been made a part of this Standard Definitive Design. *The OPMG Criteria is* [sic] *included in Appendix B*.

## 2.3 STANDARD DEFINITIVE DESIGN DRAWINGS

The U.S. Army Corps of Engineers (USACE), as the Center of Standardization for Army Access Control Points, developed Standard Definitive Design drawings for ACP's. *These drawings incorporate both the Army Standards and the OPMG Criteria*. They also provide mandatory requirements and recommendations to Army ACP designers and Installation Security Specialists for designing Army ACPs. *The drawings have been made a part of this Standard Definitive Design and are included in Appendix C.*

---

to either clear the barrier or stop safely in front of it before it is closed.

Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), ¶ 4 (boldface in original, italicized emphasis supplied).

15

*Id.*, ¶¶ 2.1 – 2.3, at 2-3 (boldface in original, emphasis and alterations supplied).[31]

2.  **Appendix A to the Basic Design Regulation**—*Standards promulgated by the Army Facilities Standardization Committee*

Appendix A contains design standards promulgated by the Army Facilities Standardization Committee on December 14, 2004. The Foreword to that regulation states that it "establishes mandatory features" for Access Control Points at "all active Army installations,"[32] and Paragraph 2-2.1 uses the obligatory phrase "must be" to mandate that Access Control Points "be designed to ensure [the] safety of motorists, pedestrians, and guards." Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app. A (Army Standard for ACPs), ¶ 2-2.1, at 2 (alteration

---

[31] The drawings specified for inclusion in Appendix C were not among the materials identified as Defendant's Exhibit 11. Consequently, the court cannot ascertain what light those design criteria might cast upon the issues of this case.

[32] Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app. A (Army Standard for ACPs), at *ii* (1st para.). The statement quoted in text is reinforced in the third and fourth paragraphs of the Foreword, as follows:

> The Army Standard for Access Control Points is *mandatory* for operations and maintenance projects starting FY2006 and beyond. For programing purposes requiring the use of Military Construction, Army/Army Reserve/National Guard appropriations, all projects from FY 2008 and after *must apply* the Army Standard.

> Only the Army Facilities Standardization Committee has the authority to approve exceptions to this standard. Waivers for the Army Standard must be approved through the installation management chain of command in accordance with AR 415-15. . . .

*Id.* (3d & 4th para.) (emphasis supplied). *See also id.*, ¶ 1-1 ("This document provides standards for Army access control points (ACPs)."), and ¶ 1-2 ("This Army Standard applies to all Army active installations and reserve components . . . ").

16

supplied).[33]

**3**.    **Appendix B to the Basic Design Regulation**— *Standards promulgated by the Office of the Provost Marshal General*

Appendix B incorporates design standards promulgated by the Army's Office of Provost Marshal General ("OPMG") on November 19, 2004.  Relevant criteria are summarized below.

**a**.    ***Threat scenarios addressed by the OPMG design standards***

The OPMG standards use the obligatory phrase "shall be designed" to

---

[33] The full text of the quoted regulation reads as follows:  "ACPs must be designed to defeat the vehicle and pedestrian threats prescribed in the ACP Criteria from the Office of the Provost Marshal General (Appendix B in the Standard Designs for ACPs), and to ensure safety of motorists, pedestrians, and guards."  Additional standards that have some bearing upon the issues of this case include the following:

> 2-2.2.2 **Active Vehicle Barriers**.  Active vehicle barriers, controlled by ACP guards, must be utilized in each inbound and outbound lane to permit or deny vehicle access.

> 2-2.2.3 **Active Vehicle Barrier Safety**.  An active vehicle barrier safety regime must be utilized that conforms to one of the Surface Deployment and Distribution Command – Transportation and Engineering Agency (SDDC-TEA) approved safety protocols.  [**Note**: *Neither party offered a copy of these safety protocols at trial*.]

> * * * *

> 2-2.6  **Turn-around Lanes**.  ACPs must have at least two turn-around lanes, one before and one immediately after the identity check or vehicle search area.

> 2-2.7  **Gatehouse**.  *ACPs must have a gatehouse with the primary controls for the final active vehicle barriers*.  The gatehouse must be sized to accommodate ACP guards and their activities.

*Id*. at 2-3 (boldface in original, alteration and italicized emphasis supplied).

emphasize that Access Control Points

shall be designed to defeat the following four minimum vehicle threat scenarios. Additional vehicle threat scenarios may be considered if supported by a local threat assessment.

1) Vehicle Threat Scenario #1. Threat vehicle enters the ACP in the inbound or outbound lane(s) at the maximum speed attainable at the ACP entrance *and then immediately accelerates at its maximum acceleration rate through the ACP*. Army policy sets the maximum acceleration rate of a threat vehicle at 11.3 f/s/s.

2) Vehicle Threat Scenario #2. Threat vehicle enters the ACP in the inbound or outbound lane(s) at or under the posted ACP Speed Limit and then, later at some point further in the Approach Zone, *accelerates at its maximum acceleration rate through the rest of the ACP*.

3) Vehicle Threat Scenario #3. Threat vehicle attempts to covertly enter the ACP, but is detected and denied entry by guards at the ID Check Area. Vehicle driver then defies guards *and accelerates through the rest of the ACP at the vehicle's maximum acceleration rate*.

4) Vehicle Threat Scenario #4. Similar to Threat Scenario 3 above, except the driver of the denied vehicle drives toward the Turn-around or Search Area at the ACP Speed Limit (25 mph) as if complying with guard instructions, *but then fails to turn and instead accelerates at its maximum acceleration rate through the rest of the ACP*.

Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app.

B (ACP Criteria From OPMG), ¶¶ I.5.a.1 – a.4, at 2-3 (emphasis supplied).

### b. *The requirement of a single, master-control button*

Various other provisions of the OPMG regulation require the installation of

active vehicle barriers in all inbound and outbound lanes of primary and secondary

access control points,[34] and mandate that a "master 'Emergency Fast Operate' (EFO) button" be used to *simultaneously* "close *all* active barriers in *all inbound and outbound lanes*." *Id*., ¶ I.20.f.1, at 8 (emphasis supplied).[35]

### 4. General Orders specifically applicable to Redstone Arsenal

General Orders specifically governing the procedures for controlling all Access Control Points on Redstone Arsenal were promulgated by the Chief of the garrison's Physical Security Division in the Directorate of Emergency Services on September 29, 2010. *See* Plaintiff's Ex. 1, at 11–33. Colonel Sheehy described the Orders as "a directive that is compulsory in nature,"[36] and issued in order to "add specificity to the

---

[34] Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app. B (ACP Criteria From OPMG), ¶ I, at 2 ("The following requirements apply to Primary and Secondary ACPs except as noted: . . ."); *id*., ¶ I.2.b, at 2 ("The perimeter of the ACP, except at its entrance, shall include both passive and active vehicle barriers arranged to form a contiguous barrier to vehicles. Active vehicle barriers, that can be opened and closed, shall be deployed at the end of the ACP (i.e., at the entrance to the Installation)."); *id*., ¶ I.2.c, at 2 ("ACP guards will control the active vehicle barriers to deny or permit entry into the Installation."); *id*., ¶ I.20.a, at 6 ("Active barriers shall be installed in all inbound and outbound lanes at the end of the Response Zone.").

[35] The full text of the OPMG paragraph from which the textual quotes are taken reads as follows:

> Only guards in the Gatehouse, Guard Booths, and Overwatch Position shall have emergency close control of the active barriers. *A master "Emergency Fast Operate" (EFO) button shall be provided on a Barrier Master Control Panel located in the Gatehouse.* Slave EFO buttons shall be located in each Guard Booth and the Overwatch Position. *The 'Emergency Fast Operate' buttons will close all active barriers in all inbound and outbound lanes.*

*Id*., ¶ I.20.f.1, at 8 (emphasis supplied).

[36] Doc. no. 51 (Transcript – Sheehy), at 14.

Army-level directives" discussed in the preceding subsections.[37]

### a. Obtaining a form of governmental identification

The General Orders instruct Gate Security Guards to obtain some form of governmental identification from all visitors who seek, but are denied, access to the garrison, and to record specific information on a "vehicle turn-around document":

> **a**. Prior to denying access to the installation, ACP personnel *will conduct* inquiries to determine visitor access: (If able to validate visit, process, inspect and issue visitor pass. If unable to validate the visit, initiate turn around procedures.)
>
> (1) *Obtain a form of government ID* (local, state, federal photo identification)[38]
> (2) What is the nature of your visit? (Official or Personal)
> (3) Who are you here to visit?
> (4) Do you have a contact number of the person you are visiting?
>
> * * * *
>
> **c**. When vehicles are denied entrance to RSA, the following information *will be recorded* on the vehicle turn-around document:
>
> (1) Reason for turnaround: Be very specific as to the reason for access denial.
> (2) Drivers Name and other pertinent information.
> (3) License Plate Number and state of issue.
> (4) Make, model, year, color and type of vehicle (2005 Blue Chevy

---

[37] *Id*. at 37 (alteration supplied). Sheehy said that Army Regulation 190-16 (Plaintiff's Ex. 2, at 2-3) was the authority for issuing such General Orders. *Id*. at 14-15.

[38] The General Orders elsewhere specify that the required forms of Governmental identification include "a valid driver's license, valid state registration and valid motor vehicle proof of insurance . . . Additionally, an approved US Government picture ID (issued by a Federal, State, or Municipal government) is required for all persons in the vehicle age 16 and older." Plaintiff's Ex. 1, ¶ 2.c, at 13. *See also id*., ¶ 2.f, at 15 (same).

Impala 2DR).

*Id*., ¶¶ 9.a. & c., at 22 (emphasis and footnote supplied).  Despite the omission of a

mandatory adverb, such as "must," from the directive stated in Paragraph 9.a(1) above

— *i.e.*, "Obtain a form of government ID" — the structure of that directive implies

an obligatory, non-discretionary requirement.[39]

### b. Threat scenarios authorizing deployment of GRAB System Barriers

The General Orders also contain three appendices containing specific

instructions for deploying each of the three "active vehicle barrier systems" used on

Redstone Arsenal.[40]  The second appendix ("Annex B") addresses Ground Retractable

Automobile Barrier (GRAB) Systems, and "establishes procedures to be followed by

all Security Force personnel posted at the Access Control Points (ACP) in the

Operation and Deployment of the GRAB System."[41]  Similar to the OPMG criteria

applicable to *all* Army installations discussed in subsection III.B.3.a., *supra*, the

General Orders also describe threat scenarios that authorized Gate Security Guards

to deploy the GRAB System's barriers:

---

[39] *See supra* note 28, listing terms used to designate mandatory requirements in Army regulations.

[40] The "active vehicle barrier systems" addressed in the appendices to the General Orders are: Roadblade Perimeter Protection System ("Annex A"); the GRAB System deployed here ("Annex B"); and Stop Sticks ("Annex C").

[41] Plaintiff's Ex. 1, app. B, at 29.

(1) Unauthorized Vehicle Access and Gate Runners: *The decision to deploy the GRAB Barrier System will be at the discretion of the security personnel in the lane that the unauthorized vehicle is attempting to access* or the guard performing overwatch duties. If a threat is perceived, Guard personnel are authorized to immediately deploy the GRAB System. Threat scenarios meeting this criteria are:

    a. High Speed Attack From Outside Installation:
- The threat vehicle enters the ACP at whatever speed it can attain at the ACP entrance.
- The vehicle could be using the in-bound or out-bound lanes.
- For a straight roadway coming into the ACP, the threat vehicle's entrance speed can be quite high.

    b. High Speed Attack After Entrance:
- The threat vehicle enters the ACP at a speed slightly below the setting of the over-speed detector at the ACP entrance.
- Once past the over-speed detector, the threat vehicle then begins its attack by accelerating toward the final barriers.

    c. Covert Attack at ID Check Area:
- The driver of the threat vehicle attempts to gain access using false credentials.
- The guards deny access and direct the driver to either the Search Area or Turn-around lane.
- The driver defies the guard instructions and immediately bolts toward the final barrier.

    d. Covert Attack at End of the Turn Around Lane:
- The driver of the threat vehicle attempts to gain access using false credentials.
- The guards deny access and direct the driver to either the Search Area or the Turn-around Lane.
- The driver feigns compliance with the guard instruction and approaches the Response Zone [*i.e.*, "the area between the guard booth and the GRAB barrier," 900 feet west of Gate 1 on both the inbound and outbound lanes[42]] at the ACP speed limit.
- *Instead of turning into the Search Area or Turn-around lane*

---

[42] Doc. no. 51 (Transcript – Sheehy), at 49.

> *when reaching the Response Zone entrance,*[43] *the driver bolts toward the final barrier.*

Plaintiff's Ex. 1, app. B, ¶¶ 4.b(1)a.–d., at 29-30 (emphasis, alterations, and footnotes supplied).

### c.   Ensuring that innocent vehicles would not be affected

The General Orders also mandated that "Security Guard deploying the GRAB Barrier System *will make a reasonable effort* to ensure that there are no other vehicles that will be directly affected by deploying the GRAB Barrier System."[44] *Id*., ¶ 4.b(4), at 30 (emphasis supplied).

## C.   The Viability of Plaintiff's Claims Under the *Gaubert* Test

### 1.   *The requirement of a single, master-control button*

As discussed in Part III.B.3.b., *supra*, the decision to design the GRAB System installed at Gate 1 on Redstone Arsenal with a single, master control button that simultaneously deployed the GRAB barriers stored under *both* the inbound *and outbound* lanes of Martin Road was mandated by the regulations promulgated by the Office of the Army's Provost Marshal General:  *i.e.*, "A master 'Emergency Fast Operate' (EFO) button shall be provided on a Barrier Master Control Panel located

---

[43] *Id*. at 49-50 (observing that the turn-around lane at Gate 1 – *sometimes referred to as* "*the response zone entrance*" – is located immediately past the guard booth.  "At other Access Control Points, the entrance is a further distance down the road.  But in the case of Gate 1, the turnaround point is immediately after the guard shack.").

[44] Plaintiff's Ex. 1, app. B, ¶ 4.b(4), at 20 (emphasis supplied).

in the Gatehouse. . . . The 'Emergency Fast Operate' buttons *will close all active barriers in all inbound and outbound lanes*." Defendant's Ex. 11 (Standard Designs for ACPs), app. B (ACP Criteria From OPMG), ¶ I.20.f.1, at 8 (emphasis supplied).[45]

Plaintiff attempted to overcome the force of that mandatory design standard by eliciting testimony from Colonel Sheehy that, prior to the date of plaintiff's injuries, he and other officers in the garrison's chain-of-command had recognized the risk that Gate 1's "master Emergency Fast Operate" control button posed for innocent, non-threat motorists in the outbound lanes of Martin Road.[46] Their recognition of that specific danger was manifested in an electronic mail message transmitted by Colonel Sheehy to Colonel John Hamilton, the Garrison Commander, and several other Arsenal officials shortly after the incident leading to this suit, and stating in pertinent part that:

> The enduring concern is the mandated dual activation of both inbound and outbound traffic lanes. The risk and concern we anticipated manifested itself in today's accident, and we are fortunate there were not additional or more serious injuries. I believe we should challenge this design mandate to DA [*i.e.*, Department of the Army], and will coordinate with Mike Moore and team to establish a way ahead on this. Will keep you posted.

---

[45] Colonel Sheehy testified that the single, master-control button depressed by Gate Guard Jones at Gate 1 complied with mandatory Army regulations, whereas it was Gate 9 — with two activation buttons, which allowed Gate Guards to selectively activate the GRAB barrier under *either* the inbound lanes *or* the outbound lanes (*see supra* note 20) — that was out of compliance. Doc. no. 51 (Transcript – Sheehy), at 58-60.

[46] *Id*. at 21-22; *id*. at 187.

Plaintiff's Ex. 30, fourth ¶ (alteration supplied).[47]

Nevertheless, until such time as the Department of the Army grants permission to deviate from the OPMG design requirement, Army personnel have "no rightful option but to adhere to the directive." *Gaubert*, 499 U.S. at 322.

Accordingly, the discretionary function exception to FTCA liability deprives this court of subject-matter jurisdiction over plaintiff's claim that it was negligent to design the GRAB System installed at Gate 1 with a single, master-control button, and

---

[47] *See also* doc. no. 51 (Transcript – Sheehy), at 187. The full text of Col. Sheehy's email message (Plaintiff's Ex. 30) reads as follows:

> We had a gate runner, which prompted the guard to activate the barrier system. In addition to activating for the inbound traffic lanes, the system activated for outbound traffic, per COE [*i.e.*, Corp of Engineers] specs. Resultantly, an outbound vehicle with a single female occupant, reportedly an MSFC [*i.e.*, Marshall Space Flight Center] employee, struck the barrier at a moderately high rate of speed. Though ambulatory, she was badly impacted and was evacuated to HSV main via HEMSI with unknown injuries. She likely has a broken arm.

> We shut down Gate 1 outbound lane for the response, and we've since reopened it fully.

> The gate runner was an elderly gentleman who misunderstood the guard's turn-around instructions. We are reviewing the specific instructions given. It appears the guard may have given less than full guidance (relative to the turn-around sign we installed last year) and not retained the driver's ID, per standard procedure. Following our review we will implement remedy as appropriate.

> The enduring concern is the mandated dual activation of both inbound and outbound traffic lanes. The risk and concern we anticipated manifested itself in today's accident, and we are fortunate there were not additional or more serious injuries. I believe we should challenge this design mandate to DA [i.e., Department of the Army], and will coordinate with Mike Moore and team to establish a way ahead on this. Will keep you posted. [Alterations supplied.]

that claim must be dismissed. *Id.* at 324 ("Under the applicable precedents, therefore, if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation.").

2. ***Gate Guard Jones's failure to retain Mr. Bannister's driver's license, which contributed to Bannister's failure to turn his vehicle around and exit Army property***

Gate Guard James Jones admitted that he did not obtain a state driver's license or other form of governmental identification from Mr. Bannister, as required by General Order Paragraph 9.a.1, discussed in Part III.B.4.a, *supra*, and retain that document until Bannister entered the turn-around lane and was prepared to exit Arsenal property.[48]  Jones also failed to record the information mandated by Paragraph 9.c on a "vehicle turn-around document."

Jones characterized those portions of the General Orders as discretionary "guidelines," or merely suggested operating practices.[49]  Colonel Sheehy described the requirement as a "best-in-class practice"[50] that was "always within the guard's

---

[48] Doc. no. 51 (Transcript – Jones), at 82-83.

[49] *Id.* at 83 (characterizing the requirements of the General Orders as "our SOP, which is a guideline," and adding that "we are also given what is called officer discretion."

[50] Doc. no. 51 (Transcript – Sheehy), at 19-20 (characterizing the retention of a person's driver's licence until such time as he complied with the instruction to turn his vehicle into the turn-around lane and was prepared to exit the Arsenal as "what I would call a best-in-class practice.  It is — and it was a standard procedure that was generally followed at that time, but it was not a required procedure").

discretion."[51] This court does not believe that the testimony of Gate Guard Jones and Colonel Sheehy can change the mandatory terms of the regulation into a discretionary practice, but even if it were assumed that it could, the second part of the *Gaubert* test does not provide the Government any relief.

One purpose of training Gate Security Guards to retain the identification of a person denied access to the Arsenal was to provide an incentive for that driver to obey the instruction to turn his vehicle around, and exit the garrison.[52] As Colonel Sheehy admitted, a driver would "be less likely to drive off" without his license.[53] Moreover, Gate Guard Jones offered only two justifications for exercising his "discretion" to ignore the requirements: *i.e.*, when no other Security Guards were on duty in the Gatehouse; or, the other Guards were otherwise indisposed.[54] Significantly, however, neither Jones nor any other Government witness testified that either circumstance existed when Mr. Bannister arrived at Gate 1.

Thus, even viewing General Order Paragraphs 9.a.1 and 9.c as discretionary "guidelines" or "best-in-class practices," the choice of Gate Guard Jones to ignore

---

[51] *Id.*, at 62-64.

[52] *See* doc. no. 51 (Transcript – Sheehy), at 20 (agreeing that "a collateral advantage" of the requirement to retain the ID of a person denied access was "to incentivize that individual to turn around").

[53] *Id.* at 20-21.

[54] *See* doc. no. 51 (Transcript – Jones), at 83-85.

those requirements was not grounded in a consideration of the public policies stated in the regulation discussed in Part III.B.1, *supra*: that is, the omissions did not aid in preventing an unauthorized vehicle from entering the installation.[55]  Thus, Jones's failure to comply with the General Orders' directives was not the kind of conduct that the discretionary function exception was designed to shield.  *See*, *e.g.*, *Berkovitz*, 486 U.S. at 536; *Autery*, 992 F.2d at 1526-27.

### 3.    *Jones's decision to activate the GRAB System when none of the threat scenarios specified in pertinent Army regulations were presented*

Of the four threat scenarios described in the ACP Criteria From OPMG discussed in Part III.B.3.a., *supra*, only the third and fourth approximate the events that led to this suit:  *i.e.*,

> 3)    Vehicle Threat Scenario #3.  Threat vehicle attempts to covertly enter the ACP, but is detected and denied entry by guards at the ID Check Area.  Vehicle driver then defies guards *and accelerates through the rest of the ACP at the vehicle's maximum acceleration rate.*

> 4)    Vehicle Threat Scenario #4.  Similar to Threat Scenario 3 above, except the driver of the denied vehicle drives toward the Turn-around or Search Area at the ACP Speed Limit (25 mph) as if complying with guard instructions, *but then fails to turn and instead accelerates at its maximum acceleration rate through the rest of the ACP.*

Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app. B (ACP Criteria From OPMG), ¶ I.5.a (emphasis supplied).  Moreover, Mr.

---

[55] *See* Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), ¶ 1.3, at 2.

Bannister's actions did not fit any of the threat scenarios described in those portions of the General Orders discussed in Part III.B.4.b., *supra*.

Even so, there were important factual distinctions between Mr. Bannister's actions and the threat scenarios outlined in that regulation. When Bannister, who appeared "confused" and "lost,"[56] drove past the turn-around lane, his truck neither approached its "maximum acceleration rate,"[57] nor "bolt[ed] toward the final barrier."[58] Instead, as Gate Guard Jones testified, Mr. Bannister proceeded forward "at an average take-off speed" of "about 10 to 15 miles an hour."[59] For the same reasons, Mr. Bannister's actions did not fit any of the threat scenarios described in thos portions of the General Orders discussed in Part III.B.4.b, *supra*.

Given those considerations, it appears that the judgment of Gate Guard Jones that Mr. Bannister was "a gate runner"[60] who posed a threat to the security of the Army garrison was not rationally grounded in fact. Even so, the threat scenarios sketched in the referenced regulations are examples, and not exclusive limitations. Colonel Sheehy described them as

---

[56] Doc. no. 51 (Transcript – Jones), at 81.

[57] Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), app. B (ACP Criteria From OPMG), ¶¶ I.5.a.3 & a.4.

[58] Plaintiff's Ex. 1, app. B, ¶¶ 4.b(1)c. & d., at 30 (alteration supplied).

[59] Doc. no. 51 (Transcript – Jones), at 85.

[60] *Id*. at 83.

descriptive in nature, and . . . not intended to be all inclusive.  There are hundreds, if not thousands, of different scenarios that could occur under any different conditions.  And the guard has not just the responsibility, but the authority and mandate and *the discretion* along with that to determine when to activate the barrier system if he perceives there's a threat.  And *it's a total assessment*.

* * * *

You can never predict all the scenarios that might be applicable.  And that's the guard's training *and discretion* as to when to apply the system.

Doc. no. 51 (Transcript – Sheehy), at 54-55 (emphasis and ellipses supplied).[61]

Nevertheless, the lack of congruence between Mr. Bannister's actions and the vehicle threat scenarios described in regulations should not be evaluated in isolation, but in conjunction with the following claim — in Colonel Sheehy's phrase, "it's a total assessment."  *Id*.

4.	*Jones's failure "to make a 'reasonable effort to ensure' that no other vehicles would be affected by deploying the GRAB System"*

As noted in Part III.B.5.c., *supra*, Redstone Arsenal's General Orders state in obligatory terms that "[t]he Security Guard deploying the GRAB Barrier System *will make* a reasonable effort *to ensure* that there are no other vehicles that will be directly affected by deploying the GRAB Barrier System."  Plaintiff's Ex. 1, app. B, ¶ 4.b(4)

---

[61] *See also* Defendant's Ex. 11, (Basic ACP Design Regulation), app. B (ACP Criteria From OPMG), ¶ 1.5.a, at 2 ("ACPs shall be designed to defeat the following four *minimum* vehicle threat scenarios.  *Additional vehicle threat scenarios may be considered if supported by a local threat assessment*.") (emphasis supplied).

at 30 (alteration and emphasis supplied). The phrase "will make" is mandatory, but the object of that phrase ("a reasonable effort") implies some degree of judgment or choice on the part of the Gate Guard when attempting to determine whether any other vehicles would be directly affected by deploying the GRAB Barriers. *Cf.*, *e.g.*, *Ochran*, 117 F.3d at 500.

Despite the lack of specificity of "a reasonable effort," the phrase clearly contemplates that the Gate Guard will make *some effort* to determine whether any other vehicles would be directly affected by deploying the GRAB Barriers *before* activating the system. However, the evidence in this case is clear and unequivocal that Jones made *no effort whatsoever*.[62]

Stated differently, Jones did not have discretion to completely disregard an Order that was otherwise compulsory in nature[63] by failing to make *any effort* to ascertain whether innocent motorists in the outbound lanes of Martin Road would be affected by his deployment of the GRAB barriers, especially when the following facts are taken into account: Mr. Bannister was elderly and obviously confused or lost;[64] his truck did not "bolt" forward "at its maximum acceleration rate"; and, the GRAB

---

[62] *See*, *e.g.*, doc. no. 51 (Transcript – Jones), at 87-88.

[63] *See* doc. no. 51 (Transcript – Sheehy), at 13 (describing an Order as "a directive that is compulsory in nature"); Plaintiff's Ex. 1, at 11 (Redstone Arsenal General Orders), ¶ 1.e ("Security Forces will adhere to the General Orders, appendices and all applicable regulatory requirements pertaining to the assigned ACP.").

[64] *See* doc. no. 51 (Transcript – Jones), at 81.

Barrier under the inbound lanes of Martin Road was located some 900 feet from the Gatehouse: a distance that was "designed to give the guards . . . enough time to assess the situation and to activate the GRAB net barrier before a potential threat [could] enter the Arsenal."[65] Those facts underscore the conclusion that the choice of Gate Guard James Jones to make *no effort*, much less "a reasonable effort," to ensure that no other vehicles would be directly affected by deploying the GRAB Barrier System was not grounded in considerations of one of the fundamental policies stated in Army regulations: that of ensuring the safety of innocent motorists. *See*, *e.g*., Defendant's Ex. 11 (Army Access Control Points Standard Definitive Design), ¶ 1.3, at 2 (mandating that Access Control Points "shall be designed . . . [2] *to ensure safety of innocent ACP users . . . .*") (boldface removed, ellipses, alteration, and emphasis supplied); *id*., app. A (Army Standard for ACPs), ¶ 2-2.1, at 2 ("ACPs must be designed . . . to *ensure safety of motorists . . . .*") (ellipses and emphasis supplied). Accordingly, Jones's activation of the GRAB System under the circumstances described was negligent, and his act was not the kind of conduct the discretionary function exception was designed to shield. *Cf. Downs v. United States Army Corps of Engineers*, 333 F. App'x 403 (11th Cir. 2009).

## IV. CONTRIBUTORY NEGLIGENCE

---

[65] Doc. no. 51 (Transcript – Sheehy), at 42 (ellipsis and alteration supplied).

The Government's second defensive contention is based upon Alabama's doctrine of contributory negligence, which provides that "'a plaintiff cannot recover in a negligence suit where plaintiff's own negligence is shown to have proximately contributed to his damage, notwithstanding a showing of negligence on the part of the defendant.'" *Phillips v. Seward*, 51 So. 3d 1019, 1025 (Ala. 2010) (quoting *Brown v. Piggly-Wiggly Stores*, 454 So.2d 1370, 1372 (Ala. 1984)).[66]

Alabama law generally defines negligence as the failure to do what a reasonably prudent person would have done under the same or similar circumstances. *See*, *e.g.*, *Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala. 1995); *Elba Wood Products, Inc. v. Brackin*, 356 So. 2d 119, 122 (Ala. 1978); *Glenn Construction Co., LLC v. Bell Aerospace Services, Inc*., 785 F. Supp. 2d 1258, 1282 (M.D. Ala. 2011).[67]

However, the standard of care required of a person can be established as a matter of law by a statute, municipal ordinance, or regulation. *See generally* Jenelle Mims Marsh, *Alabama Law of Damages* § 30.3, at 686-87 (6th ed. 2012); Note, *The Doctrine of Statutory Negligence in Alabama*, 27 Ala. L. Rev. 155 (1975). When a

---

[66] *See also*, *e.g.*, 1 Michael Roberts & Gregory S. Cusimano, *Alabama Tort Law* § 202, at 152 (6th ed. 2015) ("A plaintiff whose contributory negligence proximately contributed to his injury is completely barred from recovering for negligence of the defendant.").

[67] *See also*, *e.g.*,2 *Alabama Pattern Jury Instructions – Civil* § 28.01 (3d ed. 2016) ("Negligence is the failure to use reasonable care to prevent harm to oneself or others. A person's conduct is negligent when (he/she) either does something that a reasonably prudent person would not do in a similar situation, or (he/she) fails to do something that a reasonably prudent person would have done in a similar situation.").

statute, ordinance, or regulation establishes the applicable standard of care, "anyone who violates it and causes an injury to a person whom the statute was intended to protect is liable for negligence *per se. . . .* Proof of a violation of the statute is proof of negligence." *Parker Building Services Co. v. Lightsey ex rel. Lightsey*, 925 So. 2d 927, 931 (Ala. 2005) (citing *Thomas Learning Center, Inc. v. McGuirk*, 766 So. 2d 161, 171 (Ala. Civ. App. 1998)).

For example, if plaintiff had been driving upon an Alabama highway *outside* the boundaries of Redstone Arsenal, on a roadway governed by the "Alabama Rules of the Road,"[68] as opposed to the outbound lanes of Martin Road on land owned and controlled by the United States Army, the following State statutory provisions would have governed the operation of her automobile: Ala. Code § 32-5A-31(a) (1975) (2010 Replacement Vol.) ("The driver of any vehicle shall obey the instructions of any official traffic-control device applicable thereto placed in accordance with law . . . ."); *id*. § 32-5A-34(a)(1) ("When a red lens is illuminated with rapid intermittent flashes, drivers of vehicles shall stop at a clearly marked stop line . . . ."); *id*. § 32-5a-34(a)(2) ("When a yellow lens is illuminated with rapid intermittent flashes, drivers of vehicles may proceed through the intersection or past such signal only with caution."); *id*. § 32-5A-171(5) (providing, in relevant part, that it is unlawful for a

---

[68] *See* Ala. Code §§ 32-5A-1 to 32-5A-195 (1975) (2010 Replacement Vol.).

person to operate a vehicle *at a speed* "*greater than 55 miles per hour* at any time unless a different maximum rate of speed is authorized by the Governor under authority granted in subdivision (6) or as provided in subdivision (7)") (emphasis supplied).

The Government's attorneys did not offer copies of similar Army regulations governing the operation of motor vehicles on Redstone Arsenal. If they had done so, and if defense counsel had proved that plaintiff violated any one or more of the comparable regulatory rules of the road, that would constitute negligence as a matter of law (or, as it often is called, negligence *per se*). *See Parker Buildings Services*, 925 So. 2d at 930-31. *See also*, *e.g.*, 1 *Alabama Pattern Jury Instructions – Civil* § 26.21 (Violation of Rule of the Road or Municipal Traffic Ordinance — Negligence Per Se) (3rd ed. 2016).

Even so, proof that plaintiff was negligent as a matter of law does not absolve the Government of the obligation to prove that her violation of one or more of the Army regulatory rules of the road was the proximate cause of her injuries. *Cf.*, *e.g.*, *Parker Building Services*, 925 So. 2d at 931 (holding that it must be proved that the statutory violation "proximately caused the injury"); *Fox v. Bartholf*, 374 So. 2d 294, 295 (Ala. 1979) ("The jury [or other finder of the facts] must find the statutory violation proximately caused the injury.") (alteration supplied, and citing *Cox v.*

*Miller*, 361 So. 2d 1044 (Ala. 1978); *Vines v. Plantation Motor Lodge*, 336 So. 2d 1338 (Ala. 1976); *Allman v. Beam*, 272 Ala. 110, 130 So. 2d 194 (1961)).[69]

Accordingly, the following subsections address the issues of whether the Government proved that: plaintiff ignored the visual and audible warnings of the impending deployment of the GRAB System's Barriers, and/or that her automobile exceeded the posted speed limit of 40 miles per hour when approaching Gate 1; and, if so, whether such negligence as a matter of law was a proximate cause of her injuries.

A. **The Effectiveness of the GRAB System's Visual and Audible Warnings**

Colonel Sheehy testified that, when a Gate Guard deployed the GRAB System's barriers, an audible alarm and blinking traffic signals were simultaneously activated for the purpose of alerting motorists to the fact that the barriers stored below the road surface were about to be raised, and as a warning to stop their vehicles.[70]

> It's set up to provide the public sufficient audio and visual warning so that when the system is being activated [motorists] have the opportunity, if they're driving under the speed limit, that affords them enough time

---

[69] *See also*, *e.g.*, 1 *Alabama Pattern Jury Instructions — Civil* § 26.23 (Contributory Negligence – Violation of Rule of the Road or Municipal Traffic Ordinance) (3rd ed. 2016); Jenelle Mims Marsh, *Alabama Law of Damages* § 30.3, at 687 (6th ed. 2012) (observing that "proof of a violation of a statute or ordinance regulating the operation of a motor vehicle does not, per se, impose liability for injuries caused by the vehicle in the absence of proof that the violation proximately caused the injuries") (footnote omitted); Note, *The Doctrine of Statutory Negligence in Alabama*, 27 Ala. L. Rev. 155, 168-70 (1975).

[70] Doc. no. 51 (Transcript – Sheehy), at 43.

to slow down and stop before colliding with the barrier.

So the warning lights and the audio alarm initiate . . . immediately upon the guard's activation of the button. There's a delay in the raising of the barrier that . . . corresponds with the speed limit so that if a vehicle . . . is too close to stop in time, they will not collide with the barrier because of the delay, again calculated relative to the speed limit.

There's also a sensor system so [that] if . . . the vehicle is within the proximity of that sensor and the barrier — the barrier will not activate. But if the vehicle is outside of that sensor system, they should have sufficient time to stop before the barrier is raised.

Doc. no. 51 (Transcript – Sheehy), at 43 (alterations and ellipses supplied).

Kirk Alan Schneider, an employee of a private contractor supporting the work of the U.S. Army's Missile Defense Agency on Redstone Arsenal, was driving a motor vehicle just ahead of plaintiff's automobile at the time of the events leading to this suit. He testified that it was a warm Spring day and the windows of his "Hummer" Sport Utility Vehicle were open. Moreover, as a result of the fact that the radio in his vehicle "was broken," he was not "listening to any music" and "could hear just about anything."[71] Even so, as he was

just about to come to that barrier . . . *maybe 10 yards from it, I thought I noticed out of the corner of my right eye a light change color, a traffic signal type light changing color. And, at the same time, I thought I heard coming into the cabin of my vehicle a faint siren or horn type*

---

[71] Doc. no. 51 (Transcript – Schneider), at 103 ("I hate air conditioning. I like to just have my windows open, 10th of May, it was already warm out, but I like the windows open. And my radio was broken in the Hummer at the time, still is. So I wasn't listening to any music. So I could hear just about anything.").

*thing.*

Well, I had never seen or heard that before.  And in an instant, I processed what that might mean.  And I'm thinking, what if that's a signal that the barrier's coming up?

Well, I was so close to the barrier, and at the speed I was going, *there was time to do only one thing, and that was nothing.  I had time to do nothing.*  So I — I kept the same speed, proceeded across the barrier. And now in my mind I'm thinking, what if something's happening?

*There's a car about a car length behind me.*  So I'm looking though my rearview mirror.

Now I'm across the barrier, and I see the car that I had overtaken [*i.e.*, plaintiff's automobile], but I also saw the barrier had come up.  It had to have been right behind my car, right behind it.  A fraction of a second after I crossed over it, I think is when the barrier must have come up.

I saw through my rearview mirror, as I'm now slowing down, her vehicle impact the barrier . . . I think at full speed.  . . .

Doc. no. 51 (Transcript – Schneider), at 103–104 (ellipses, emphasis, and alteration supplied).

Plaintiff's perception of the visual warning signals was similar to that of Mr. Schneider: she "saw a flash," but did not "know what the flash was."[72]  "I can't tell you if the flash was a light or my airbag.  I don't know.  I have no clue."[73]

---

[72] Doc. no. 51 (Transcript – Rutherford), at 144.

[73] *Id*. at 146.

Plaintiff also had no recollection of hearing an audible warning signal,[74] but that is not altogether surprising in view of the fact that the sound of the warning signal recorded on the videotape of the incident played in open court was difficult to discern, even when the volume was turned as high as the play-back device allowed. The video image also established that the windows of plaintiff's automobile were rolled up when she collided with the barrier. And, Mr. Schneider emphasized that, "[i]f my windows had been closed and/or if my radio was on, I do not think I could have heard that horn or siren. It's only because my radio was off and the windows were open that I heard that horn or siren."[75] He described the volume of the horn or siren as "faint,"[76] and he could "only guess[] what the visual signal and the audible signal meant. Nobody teaches that stuff out at the Arsenal, what it means. . . . But even worse, the signaling at the different gates [*i.e.*, the warning signals at Gates 1 and Gate 9] are all different."[77] In sum, "It's confusing. It's contradictory. And we're not educated on it one way or the other."[78]

Based upon the foregoing, uncontradicted evidence, this court concludes that the Government failed to prove that the visual and audible signals at Gate 1 were

---

[74] *Id.*

[75] Doc. no. 51 (Transcript – Schneider), at 106.

[76] *Id.*

[77] Doc. no. 51 (Transcript – Schneider), at 106 (alterations supplied).

[78] *Id.* at 107.

effective to provide plaintiff an adequate warning of the GRAB barrier's impending deployment. Consequently, the Government did not prove that she was negligent as a matter of law for ignoring either signal.

**B.**     **The Speed and Braking Distance of Plaintiff's Automobile**

Kirk Schneider also testified that, while driving his vehicle in the "left-hand" (inside) lane of Martin Road, "pretty close to the speed limit . . . within 2 or 3 miles per hour" of the posted limit of 40 miles per hour,[79] *he slowly overtook and passed plaintiff's automobile* which was traveling in the "right-hand" (outside) lane.[80]   On the basis of those facts, Schneider concluded that plaintiff must have been driving at, or slightly below, the posted speed limit as she approached Gate 1.

Q.     Do you have a judgment as to her speed as you overtook her?

A.     Yes.  I would judge it to be 40 miles an hour — 40 miles an hour, plus or minus 2 miles an hour.  Again, I was probably doing 42, if I had to guess.  I slowly overtook her.

Q.     Okay.

A.     So I would say she was probably doing exactly the speed limit.

Q.     You think she was doing probably exactly 40 miles an hour?

---

[79] *Id*. at 103 ("I was going pretty close to the speed limit, I'm sure, within 2 or 3 miles per hour, plus or minus.").  *See also id*. at 102 ("While I'm on base, I like to keep pretty close to the speed limit.  Now, off base I'm not quite so strict.  But, you know, I am 24 years post military, and I was warned you don't speed on base.  So I was going pretty close to the speed limit.").

[80] *Id*. at 103.

A.     Yes.

Doc. no. 51 (Transcript – Schneider), at 105.

Plaintiff testified, however, that she "was going *under the speed limit*. 40 [miles per hour] or below. I mean, I know not to speed on the Arsenal. I know that. Everybody knows [that]."[81] Plaintiff's account of her speed is consistent with the estimate contained in the Military Police report published just five days after the incident. Their traffic accident investigation concluded, on the basis of a time-distance analysis of a video tape recorded by a camera mounted on one of the uprights supporting the GRAB System's barrier, that plaintiff's vehicle was moving at a speed of 36.173 miles per hour, nearly four miles per hour *below* the posted limit, when it collided with the GRAB System's barrier.[82]

---

[81] Doc. no. 51 (Transcript – Rutherford), at 146 (emphasis and alterations supplied); *see also id*. at 162-163 (plaintiff reaffirms, on cross examination, her deposition testimony that she was not exceeding the 40 mile per hour speed limit: "It may have been less.").

[82] Plaintiff's Ex. 3 (May 15, 2012 Military Police Desk Blotter), at 64; *see also id*. at 135 (May 15, 2012 email from Col. Michael Sheehy to Col. John S. Hamilton stating that, by means of a "video review, TAI [Traffic Accident Investigation] calculated the speed on impact at 36 mph, in a speed limit zone of 40 mph.") (alteration supplied). A November 7, 2012 email from Army Civilian Police Captain Robert York to Col. Sheehy explained the calculation process as follows:

> Attached are the calculations that were used to determine the velocity (speed) of the vehicle [driven by Shannon Rutherford]. The calculations are based on the video from the Grab net system. Officer Ewald took a copy of the video to an employee of Dynetics Tech Services (NASA contractor) who was able to determine the time that it took the vehicle to travel from one portion of the concrete pad at the net to the other side. The time was determined to be .198 seconds. The distance traveled in this time was 10.5 feet.

> The skid marks that were documented began at the point of impact with the [GRAB

The Government was not content to rest upon the foregoing evidence of plaintiff's speed, however, and retained Joey Keith Parker,[83] a registered professional engineer employed by "3 Axis Engineering" in Tuscaloosa, Alabama.[84] Mr. Parker has testified in state and federal courts in the fields of engineering and accident reconstruction.[85] His written report and testimony asserted the following opinions:

1. "Ms. Rutherford failed to heed the horn/siren, yellow flashing lights, and overhead yellow signal lights that activated 4.7 seconds before her vehicle impacted the GRAB system gate."[86]

2. "Ms. Rutherford ran the red light that activated 2.4 seconds before her vehicle impacted the GRAB system net."[87]

3. "The speed of the Rutherford Toyota was 43 mph as it passed

---

System] net, not prior to impact.

After I reviewed the video, it appears to me that the vehicle had begun to brake prior to the impact based on the slightly downward angle of the front end of the vehicle. The difficulty with this is that we can't see nor determine the exact actions of the driver prior to entering the view of the camera. The field of view on the camera is too narrow to see actions prior to impact.

*Id.* at 133 (Nov. 7, 2012 email from Army Civilian Police Captain Robert York to Col. Sheehy) (alterations supplied). A copy of the handwritten calculations upon which Captain York's conclusion was based is found in the same Exhibit, at 138. *See also* doc. no. 51 (Transcript – Sheehy), at 23 (recalling that he had been notified that "our traffic accident investigator had assessed that she was driving within the posted speed limit").

[83] Plaintiff had no objection to Parker's designation as an expert. Doc. no. 51 (Transcript – Parker), at 192.

[84] *Id.* at 191.

[85] *Id.* at 192.

[86] Defendant's Ex. 3 (Parker Report), at 2.

[87] *Id.* at 4.

through the GRAB system."[88]

4.      "The Rutherford Toyota would have been 299 feet from contact
        with the GRAB gate when the yellow warning lights (and horn)
        first activated, 156 feet from contact when the red light first
        activated, and 80 feet from contact when the GRAB system gate
        first began to raise."[89]

5.      "The Rutherford Toyota could have been braked to a stop in a
        distance of 77 to 103 feet."[90]

The persuasiveness of those opinions is eviscerated by several facts.  The first

is that Mr. Parker's calculations of braking distances did not take into account

principles of human factors engineering — *e.g.*, the temporal interval that elapses

between a normal human's perception of a visual or audible warning signal, the

cognition of the significance of the warning(s), the mental formulation of an

appropriate response, and the time required to effect the physical response — a

critical expanse of time that, the witness acknowledged, normally consumes 2.5

seconds in an emergency situation.

BY MR. BART SINIARD [one of plaintiff's attorneys]:

Q.      Exactly.  Did you put any analysis into your report regarding
        human factors?

A.      *I don't believe there's any human factors in there.*

---

[88] *Id*. at 5.

[89] *Id.*

[90] *Id*. at 6.

Q.     Isn't that important in determining braking distance?

A.     *Braking distance* is a mechanical function ability of the vehicle.

THE COURT:  Wait a second.

Human factors establish[] that there is a time delay between a driver observing some stimulus, whether it be someone walking across the road, or in this case a signal, and then making the mental decision to brake, and then removing the foot from the accelerator and applying the brake.

Now, there are standard, generally accepted principles in human factors engineering for determining the average time delay between observing a stimulus and actually depressing the brake pedal.

And I don't see any of that in your analysis.

THE WITNESS:  Correct.  Yes, sir.  I've been to several classes that address issues of human factors and traffic reconstruction.

And the classes that I have been to have what I would call standard textbook situations.  And the closest situation to what we see here is response to a yellow traffic signal, if you're driving down the residential street here in town, and that number has been studied.

What I didn't do in this case was apply that directly to this case, because this is not a traffic signal on a residential street.  It's a different application that, as far as I know, hasn't been studied.

And, so I can tell you what the sort of rule of thumb numbers are that people use, but as far as having a number for this specific case, I'm unaware of anybody who's done that research.

BY MR. BART SINIARD:

Q.     My  research  shows  common  traffic  reaction  times  range

anywhere from 1.5 seconds to 3 seconds, depending on how common the traffic stimulus is. Do you agree with that?

A.     The number that's used in accident reconstruction for a typical response is 1-and-a-half seconds.

Q.     And that's assuming it is a common traffic stimulus; is that true?

A.     I don't know about the word "common," but an emergency situation. *The civil engineering people who do traffic design typically use 2-and-a-half seconds*, *so that's close to the range that you gave*.

Doc. no. 51 (Transcript – Parker), at 215-217 (alteration and emphasis supplied).

In addition, and as discussed in the preceding subsection (Part IV.A, *supra*), Kirk Schneider testified that the GRAB System's audible warning was so faint that it could be heard only if the windows of an automobile were down, and, no music was playing on the vehicle's radio. He also testified that the System's visual signals activated only when he was about ten yards from the barrier. Plaintiff's automobile was only a short distance behind his; and, based upon the sequence of events Mr. Schneider experienced, he testified that there was not sufficient time for her to stop before the GRAB System barrier rose from the ground.

THE WITNESS [Kirk Schneider]:  So I — I know that the [plaintiff's] vehicle was within a car length or two behind me, so that would let me judge the approximate distance that she was from the barrier.

I know approximately how fast she was going, about 40 miles an

45

hour.

I know that as I was just about on the [GRAB System's] barrier I thought I saw that light change colors, which would put her at the most, I would say[,] three car lengths from the barrier when that light would have flashed.

At her speed, even if she would have seen what I saw, and she, I would say, definitely did not hear what I heard because her windows were up. And I don't know if she was listening to a radio or not.

But even if she saw the light change, there's no way she could have stopped. She might have been able to, maybe could have slowed down if she could have seen it, but not enough to make any difference, I don't believe.

Doc. no. 51 (Transcript – Schneider), at 108-109 (alterations supplied).

Finally, Mr. Parker admitted that all of his opinions were based upon the assumption that plaintiff's automobile was moving at 43 miles per hour prior to its collision with the GRAB System barrier, and he had not made any calculations based upon a speed of 40 mph.

Q.     Okay.  So, to be clear, you have no opinion that, if Ms. Rutherford had been going 40 miles an hour, she would have avoided hitting the barrier?

A.     In the absence of braking, she would have hit the barrier.

Q.     I'm saying even with braking.

A.     With braking, depending on where, maybe, maybe not.

Doc. no. 51 (Transcript – Parker), at 222.

**C**. **Conclusions on the Contributory Negligence Defense**

Based upon all of the foregoing considerations, this court finds the testimony of Kirk Schneider and plaintiff, as corroborated by the Military Police's contemporaneous traffic accident investigation,[91] to be more credible than that of the Government's witness, Joey Keith Parker. Mr. Parker's testimony and written report failed to prove to the satisfaction of this court that plaintiff ignored the visual and audible warning signals of the GRAB barrier's impending deployment, or that she was driving her automobile faster than the posted speed limit of 40 miles per hour when approaching Gate 1. Even if the Government had proved either or both of those contentions, the Government failed to satisfy this court that such violations of the Army's "rules of the road" were the proximate cause of plaintiff's injuries. Accordingly, defendant's contributory negligence defense is rejected.

## V. FEDERAL EMPLOYEES' COMPENSATION ACT

The Government's final defensive contention is that a substantial question exists as to whether the Federal Employees' Compensation Act provides the exclusive remedy for the injuries sustained by plaintiff, Shannon Rutherford,[92] and she should have been required to file a claim with the Department of Labor's Office of Workers'

---

[91] *See supra* note 82 and accompanying text.

[92] The Federal Employees' Compensation Act program is authorized by 5 U.S.C. § 8101 *et seq*. Regulations implementing the Act are provided at 20 C.F.R. §§ 10.00-10.826. The program is administered by the Department of Labor's Office of Workers' Compensation Programs.

Compensation Programs, and to receive an adjudication of that claim, before proceeding with suit in this court under the Federal Tort Claims Act.[93]

The Federal Employees' Compensation Act of 1916, 5 U.S.C. §§ 8101–8193 ("FECA"), created a workers' compensation program for federal employees, and requires the United States to "pay compensation . . . for the disability or death of an employee resulting from personal injury *sustained while in the performance of his* [or her] *duty*," unless the injury or death was caused by the employee's own "willful misconduct, intent, or intoxication." 5 U.S.C. § 8102(a) (emphasis and alteration supplied). A federal employee who suffers an injury while performing her or his governmental duties is exclusively limited to the remedies provided by that Act. *See* 5 U.S.C. § 8116(c). Accordingly, the Federal Tort Claims Act may not be used by civilian employees of the Government as an alternative remedy "for the disability or death of an employee resulting from personal injury *sustained while in the performance of his* [or her] *duty*." 5 U.S.C. § 8102(a) (emphasis and alteration supplied). A claim for FECA benefits must be filed with the Secretary of Labor (through the Office of Workers' Compensation Programs). *See* 5 U.S.C. § 8121; *see also*, *e.g.*, *Woodruff v. United States Department of Labor*, 954 F.2d 634, 637 (11th

---

[93] *See* doc. no. 49 (Defendant's Motion for Judgment as a Matter of Law at the Close of Plaintiff's Evidence, and, at the Close of All of the Evidence); doc. no. 49-1 (Brief in support of previous motion); and doc. no. 53 (Defendant's Post-Trial Brief), at 6.

Cir. 1992) (observing that the Secretary of Labor "has delegated responsibility for FECA management to the Director of the Office of Workers' Compensation Programs").[94]   A claim for FECA benefits must be filed within three years of the injury or death, *see* 5 U.S.C. § 8122(a), although an untimely claim may be allowed if the employee's "immediate superior had actual knowledge of the injury or death within 30 days" of the event giving rise to the claim.  5 U.S.C. § 8122(a).  Moreover, in contrast with the general presumption of judicial review of agency decisions in modern law, FECA provides that the Secretary of Labor's determination of FECA benefits is "final and conclusive" and "not subject to review . . . by a court by mandamus or otherwise."  5 U.S.C. § 8128(b) (ellipsis supplied).  A substantial question of coverage under FECA is deemed to exist, *unless* the court determines "as a matter of law that, viewing all of the circumstances, the Secretary [of Labor] could not find FECA coverage of" the injury at issue.  *Concordia v. United States Postal Service*, 581 F.2d 439, 442-44 (5th Cir. 1978) (alteration supplied);[95] *see also Noble v. United States*, 216 F.3d 1229, 1235 (11th Cir. 2000) (same).

---

[94] The Office of Workers' Compensation Programs "has exclusive jurisdiction in the cases before it to decide *all* questions arising under the Act, subject to review and final decision by the [Employees' Compensation Appeals] Board."  *Anneliese Ross*, 42 E.C.A.B. 371, 375 (1991) (alteration and emphasis supplied).

[95] The Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

Despite what has been said above, nothing in the Federal Tort Claims Act excludes civilian employees of the United States *as a category* from bringing suit against the Government for injuries suffered by the negligent or wrongful acts of other federal employees.[96]  Instead, the pivotal issue is whether substantial evidence indicates that the employee's injury occurred in the performance of her governmental duties.  If not, the employee may proceed without first filing a claim under the Federal Employees' Compensation Act.  *See, e.g.*, *Bailey v. United States*, 451 F.2d 963, 965 (5th Cir. 1971) (holding that "if no substantial question of FECA coverage is presented, the employee may prosecute his tort claim without first applying to the Secretary of Labor"); *see also Avasthi v. United States*, 608 F.2d 1059, 1060 (5th Cir. 1979) ("The employee must first seek and be denied relief under FECA *unless his injuries do not present any substantial question of compensability under that act*.") (emphasis supplied).

As noted at the beginning of this opinion, plaintiff was performing no duties for her federal employer at the time and place of the events leading to this suit. Instead, she had obtained permission to be off-work, on "sick leave," and was driving in her personal automobile to a private physician's office off government property.

---

[96] *See generally* Gregory C. Sisk, *Judicial Review of Personal Injury Claims by Federal Civilian Employees:  Navigating Between the Shoals of FECA and the Crest of the FTCA*, 51 Tort Trial & Ins. Prac. L.J. 893, 897 (2016).

She was about five miles from her workplace in Building No. 4610 when she collided with the GRAB System barrier.[97] Viewing all of these circumstances, this court determines as a matter of law that the Secretary of Labor could not conclude that plaintiff's injuries were sustained while in the performance of her employment duties. *See*, *e.g.*, *Noble*, 216 F.3d at 1235; *Concordia*, 581 F.2d at 442-44.

Moreover, this court determined on two occasions prior to trial that the facts of this case did not present a substantial question of coverage under the Federal Employees' Compensation Act.[98] No new facts have been discovered, and there have been no intervening decisions that would lead this court to a different conclusion. For all of these reasons, as well as those addressed in the orders denying the Government's previous motions to dismiss this action based upon the contention that a substantial question exists as to whether FECA provides the exclusive remedy for plaintiff's injuries, this court once again rejects this defense.

## VI. DAMAGES

Plaintiff was knocked unconscious by the force of her automobile's collision with the GRAB System's steel-net barrier and the explosive impact of her vehicle's

---

[97] Doc. no. 51 (Transcript – Rutherford), at 144.

[98] *See* doc. no. 4 (Defendant's Motion and Brief to Dismiss or, in the Alternative, Motion to Stay); doc. no. 14 (Memorandum Opinion and Order denying previous motion); doc. no. 21 (Defendant's Renewed Motion and Brief to Dismiss or, in the Alternative, Motion to Stay); doc. no. 30 (Memorandum Opinion and Order denying renewed motion).

airbag. She eventually was awakened by the sound of her auto horn blaring, and by

Kirk Schneider knocking on her window, motioning for her to unlock the door. The

experience was extremely traumatic because, in addition to the pain of her ankle, arm,

shoulder, spinal, and head injuries,[99] plaintiff

> remembered smoke . . . it smelled like fire or something burning. And
> then — and, of course, I thought, you know, this is about to explode.
> And I immediately thought I've got to save myself for my daughter.
> And because I didn't want to leave her. I didn't want to leave — I just
> didn't want to leave her behind. And because I just didn't want to ever
> leave my girl behind.

Doc. no. 51 (Transcript – Rutherford), at 144.[100] She subsequently was diagnosed as

suffering from, among other things, Post Traumatic Stress Disorder,[101] an opinion that

was confirmed by the results of a Minnesota Multiphasic Personality Inventory

assessment.[102] She endured the pain of extensive surgery on her left ankle, which

entailed cutting her calf muscle and the ligament on the top of her foot, and breaking

---

[99] *See, e.g.*, doc. no. 51 (Transcript – Rutherford), at 149 ("my head was screaming . . . my head was exploding").

[100] *See also* doc. no. 51 (Transcript – Rinn), at 129 (where Dr. Roger C. Rinn, Ph.D. in Clinical Psychology, testified that plaintiff related to him during the first of six sessions of psychological counseling that she "thought that the car would explode. And she indicated that she felt she was going to die. She felt that she would have to leave her daughter as her father had at a very young age before her. She was, I think, 14 when he passed away. And all these [thoughts] went through her mind. She was, to say the least, terrified, according to her report.").

[101] *Id*. at 131.

[102] *Id*. at 130.

the ankle bone, shifting it, and screwing it back together,[103] as well as numerous, painful, post-op physical therapy sessions.

Plaintiff no longer can engage in physical activities she enjoyed prior to her injuries — *e.g.*, walking long distances,[104] jogging, marathon running, playing on several world championship softball teams,[105] playing Quarterback for a professional women's football team,[106] and snow skiing[107] — because of the risk and fear of having to undergo additional, extensive surgery on her left ankle if she should again fracture her fifth metatarsal.[108] Plaintiff's husband affirmed that she has exhibited "a lot of depression" since the accident.[109]

## A. The Parties' Stipulations

The parties stipulated that plaintiff suffered the following injuries as a

---

[103] *See* doc. no. 51 (Transcript – Rutherford), at 150-151; Plaintiff's Ex. 10 (nine photographs of plaintiff's left ankle post-surgery).

[104] *See* doc. no. 51 (Transcript – Rutherford), at 157-158.

[105] *Id*. at 155 ("I played on several world championship teams as an adult, not kids, but as an adult.").

[106] *Id*. ("I played a quarterback for the Minnesota Vixens, which . . . is a women's football team"); Plaintiff's Ex. 11 (*Sports Illustrated* magazine article about plaintiff's role as Quarterback for the "Minnesota Vixens").

[107] *See* Plaintiff's Ex. 12 (photograph of plaintiff on snow skis).

[108] *See* doc. no. 51 (Transcript – Rutherford), at 152 ("I'm not able to run" because, as a result of fracturing her fifth metatarsal twice since the original surgery, her orthopaedic surgeon told her "that if I fractured [it] a third time he's going to have to go back under and rotate the ankle"); *id*. at 156 (testifying about the mental agony of not being able to play softball with her daughter); *id*. at 157 ("running is out of the question now").

[109] Doc. no. 51 (Transcript – Robert Rutherford), at 165; *see also id*. at 166 (plaintiff's inability to continue running marathons "has affected her emotionally and mentally").

proximate result of her collision with the GRAB barrier:

  a.  ankle/foot injury with resultant surgical fixation performed by Dr. Matthew DeOrio with ensuing orthotics and physical therapy;

  b.  lumbar spine injury with resultant injection performed by Dr. Sara Nadella and ensuing physical therapy;

  c.  multiple abrasions, contusions, bicipital tendinitis in the shoulder, and migraine headaches treated by Huntsville Hospital emergency room doctors, HEMSI personnel, Dr. Scott Royster, Dr. Harry McDaris, and Dr. John Greco[;]

  d.  Plaintiff also suffered emotional and psychological trauma as a result of the incident which was diagnosed and treated by Dr. Roger Rinn.

9.  Plaintiff has endured pain and suffering as a result of her injuries.

10.  If Defendant is found liable, *Plaintiff is entitled to compensation for pain and suffering*.

11.  Plaintiff has endured mental anguish as a result of her injuries.

12.  If Defendant is found liable, *Plaintiff is entitled to compensation for mental anguish*.

Doc. no. 41 (Parties' Statement of Agreed and Disputed Facts), ¶¶ 8-12, at 5-6 (emphasis supplied).

The parties also stipulated: (a) that the aggregate amount of medical expenses actually billed by plaintiff's physicians and other health care providers (an amount that is strangely referred to in pleadings as the "Retail Amount" of her medical

bills[110]) was $69,650.81;[111] (b) that the total amount actually paid by plaintiff's health insurers was only $16,043.28 (*i.e.*, the sum of $14,938.77 paid by Blue Cross Blue Shield of Alabama, and an additional $1,104.51 paid by Blue Cross Blue Shield Federal);[112] (c) that plaintiff's out of pocket expenses for medical bills was $4,125.19; and (d) the cost of traveling to-and-from health care providers, physical therapists, and psychological counseling sessions was $998.58 (*i.e.*, 1,958 miles x 51¢ per mile).[113] The parties also filed the following contentions:

> In the event the United States is found liable, Defendant is of the position [*i.e.*, contends] that, with respect to any award relating to medical costs, Plaintiff can recover only for medical costs that she paid out-of-pocket. Defendant asserts that recent Eleventh Circuit case law clarifies that Plaintiff cannot recover for any amounts written off by insurers or medical providers. *See Bobo v. Tenn. Valley Auth.*, 855 F.3d 1294, 1311 (11th Cir. 2017) ("[A]mounts that were written off by providers under contractual agreements with insurers are not amounts that a plaintiff has paid or is obligated to pay within the meaning of the Alabama Supreme Court's decisions.").

> In the event the United States is found liable, Plaintiff is of the position [*i.e.*, contends] that Plaintiff can recover damages for out-of-

---

[110] *See* doc. no. 41 (Parties' Statement of Agreed and Disputed Facts), at 3 ("Retail Amount of Total Medical Bills: $69,650,81"); doc. no. 46 (Plaintiff's Itemization of Damages), at 1 (same).

[111] *See* Plaintiff's Ex. 21 (Medical Specials of Shannon Rutherford).

[112] Consumer Reports has aptly observed that: "The contracted prices that health plans negotiate with providers in their networks have little or nothing to do with the actual quality of services provided and everything to do with the relative bargaining power of the providers." https://www.consumerreports.org/cro/magazine/2012/07/that-ct-scan-costs-how-much/index.htm (last visited Dec. 20, 2017).

[113] *See* doc. no. 41 (Parties' Statement of Agreed and Disputed Facts), at 3; doc. no. 46 (Plaintiff's Itemization of Damages), at 1.

pocket medical costs <u>and</u> amounts paid by her health insurers. Plaintiff does not contend [that] she is entitled to recover the retail amount of medical bills.

    If Defendant is found liable, Plaintiff is entitled to compensation for lost wages in the amount of $20,000.00.

Doc. no. 41 (Parties' Statement of Agreed and Disputed Facts), at 3-4 (alterations supplied); *see also* doc. no. 46 (Plaintiff's Itemization of Damages), at 1 ("Plaintiff agrees [that] she is not entitled to recover the 'retail' amount of medical bills, but claims she is entitled to recover subrogation amounts and the other expenses outlined above, which totals: **$21,167.05**.") (alteration supplied, boldface in original); *id*. at 2 ("Lost Wages (Stipulated to by Defendant) $20,000") (boldface emphasis deleted).

Finally, plaintiff seeks the recovery of $250,000 for mental anguish, and an additional $250,000 for her physical pain and suffering.

B.    **Conclusions on Plaintiff's Damage Claims**

In accordance with the parties' stipulations, the court finds that plaintiff is entitled to recover $5,123.77 for out-of-pocket medical and mileage expenses, as well as $20,000.00 for lost wages.

Plaintiff contends, but the United States denies, that she also is entitled to recover the amounts actually paid to her physicians and other health care providers

by her health insurers.[114]  Prior to 1987, Alabama law recognized the common-law

collateral source rule, which "meant that a defendant in a personal injury case could

not obtain a reduction in a plaintiff's damages award based on that plaintiff's receipt

of medical benefits from a collateral source." *Washington v. United States*, 17 F.

Supp. 3d 1154, 1157 (S.D. Ala. 2014).  As such, a defendant was barred from

introducing evidence of such benefits. *Id.*  The State Legislature altered that rule in

1987, however, with the enactment of Act No. 87-187, which allowed admission of

evidence of medical payments from a collateral source.  *See* 1987 Acts of Alabama,

No. 87-187, at 258.  As codified, the pertinent parts of that Act provide that:

> (a)  In all civil actions where damages for any medical or hospital
> expenses are claimed and are legally recoverable for personal injury or
> death, evidence that the plaintiff's medical or hospital expenses have
> been or will be paid or reimbursed shall be admissible as competent
> evidence.  In such actions upon admission of evidence respecting
> reimbursement or payment of medical or hospital expenses, the plaintiff
> shall be entitled to introduce evidence of the cost of obtaining
> reimbursement or payment of medical or hospital expenses.
>
> * * * *
>
> (c)  Upon proof by the plaintiff to the court that the plaintiff is
> obligated to repay the medical or hospital expenses which have been or
> will be paid or reimbursed, evidence relating to such reimbursement or
> payment shall be admissible.

Ala. Code §§ 12-21-45(a), (c) (1975) (2012 Replacement Vol.).

---

[114] *Id.* at 3-4.

The Southern District of Alabama concluded that the foregoing statute altered the traditional collateral source rule, and held that "evidence of collateral-source payments is now properly admissible, but . . . it is left to the fact finder's discretion to determine whether and, if so, to what extent to reduce a plaintiff's recovery by the amount of such payments, in light of all the surrounding facts and circumstances." *Washington*, 17 F. Supp. 3d at 1158. The Alabama Supreme Court also has said that the statute's silence on its effect upon the law of damages

> can be viewed as a virtue, not a vice, because it leaves to the courts their historical function of determining the limits of recoverable damages, through an evolving common law. This statutory silence gives both a plaintiff and a defendant latitude to explore various arguments about windfalls. A defendant may desire to argue that reimbursement of the plaintiff for medical expenses already paid by an insurer is a double recovery. On the other hand, a plaintiff may wish to argue that the defendant reaps a windfall unless additional damages are awarded, beyond the mere expense of the insurance or other collateral-source benefits, so as to compensate the plaintiff for having the discipline and foresight to devote money or earning power to paying the expense of acquiring the insurance or other collateral-source benefits rather than paying for some immediate gratification.

*Marsh v. Green*, 782 So. 2d 223, 233 n.2 (Ala. 2000).

Here, the parties stipulated to the *amount* that plaintiff's health insurers paid for her medical treatment, but there is no evidence of the amount, if any, that plaintiff may be responsible for reimbursing those insurers in the event of her recovery in this action. Accordingly, this court is unable to determine whether plaintiff should

recover the amounts paid by her two insurers.

## VII. CONCLUSION

Upon consideration of the pleadings, evidence, stipulations, briefs, and arguments of counsel, it is **CONSIDERED**, **ORDERED**, and **ADJUDGED** that judgement be, and the same hereby is, entered in favor of plaintiff, Shannon Rutherford, and against defendant, United States of America, for the negligence of defendant's Gate Security Guard, James Jones, which was the proximate cause of plaintiff's injuries and damages; and that plaintiff have and recover $4,125.19 in out-of-pocket medical expenses, $998.58 in reimbursement for milage, $20,000 in lost wages, and $250,000 for mental anguish, pain, and suffering, for a total judgment in the sum or amount of Two Hundred Seventy-Five Thousand, One Hundred Twenty Three and 77/100ths Dollars ($275,123.77), together with the costs of this action, for all of which let execution issue.

**DONE** and **ORDERED** this 21st day of December, 2017.

_____
United States District Judge